CORNERSTONE PROPANE, L.P.,
Claimant–Appellant,

v.

PRECISION INVESTMENTS, L.L.C.,
Respondent–Respondent.

No. 25590.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 29, 2004.

Laurence R. Tucker, Darren K. Sharp, Armstrong, Teasdale, L.L.P., Kansas City, for appellant.

Todd A. Johnson, Paula S. Green, Ellis, Ellis, Hammons & Johnson, P.C., Springfield, for respondent.

JAMES K. PREWITT, Judge.

Cornerstone Propane, L.P. ("Cornerstone") appeals from a judgment vacating an arbitration award based on the arbitrator's alleged manifest disregard of the law in failing to give collateral estoppel effect to a judgment from a companion case. With four points relied on, Cornerstone argues that the trial court committed reversible error in vacating the award.

## Facts

Cornerstone is the successor in interest to Empire Energy Corporation ("Empire"), and was formed after Empire, which was based in Lebanon, Missouri and operated a propane gas business in 10 states, was acquired by Northwestern Growth Corporation ("NGC"). Prior to the transaction between Empire and NGC, Precision Investments, L.L.C. ("Precision") was formed under Tennessee law specifically to acquire certain real estate that was not intended to be part of the transaction between Empire and NGC. Steven Plaster, who was president of Empire, became the managing member of Precision.

One issue during the transaction was "surplus" properties used by Empire. These surplus properties were defined as "those that were no longer actively operated and used as retail propane service centers, or were scheduled to be shut down in the near future." NGC was provided with a document entitled "Empire's Surplus Property List" that contained properties owned by Empire, as well as properties owned by entities that were Plaster's family holdings, including Children Investment Company, Inc. ("CIC"), Empire Ranch,

Inc., and various trusts under the name of Robert W. Plaster ("the RWP Trusts").

As part of his role at Empire, Plaster was responsible for the surplus properties used by Empire, including any sale of such properties. Plaster, as an officer or trustee of CIC, Empire Ranch, and the RWP Trusts, was responsible for the management of properties owned by those entities.

When Plaster entered into negotiations to sell Empire to NGC in the summer of 1996, the objective was for NGC to acquire several propane companies and merge them into a single company to be named Cornerstone. *Precision Invest. L.L.C. v. Cornerstone Propane, L.P.*, 119 S.W.3d 611, 612 (Mo.App.2003). As part of the merger between Empire and Cornerstone, nine surplus properties owned by Empire were sold to Plaster under the name of Precision. *Id.* at 613. This purchase was pursuant to an "Asset Purchase Agreement," ("the Agreement") which was signed October 7, 1996. *Id.* The Agreement was made based on NGC's concerns regarding potential environmental liability associated with the properties. *Id.* Terms of the Agreement mandated that any future disputes relating to the properties be submitted to binding arbitration. *Id.*

After the merger, Plaster was retained as Executive Vice President of what was, at that time, still Empire. In his position on behalf of Precision, Plaster allowed Empire to use the surplus properties Precision owned "without charge for tank storage or other purposes until a need arose to dispose of each particular property." Plaster gave Empire the same permission as it related to surplus properties owned by CIC, Empire Ranch, and the RWP Trusts. In December, 1996, NGC formed Cornerstone by combining the assets of four propane companies, including Empire.

Plaster, who continued in a vice president position after Empire merged into NGC and Cornerstone was formed, was terminated from his position at Cornerstone on January 7, 1997. Plaster claimed that, following his termination, he informed Cornerstone that its occupation or use of the surplus properties, including those owned by Precision and those owned by the other entities (CIC, Empire Ranch, and the RWP Trusts) "was no longer agreeable."

According to Plaster, subsequent communications were sent to Cornerstone on the matter, demanding that Cornerstone "vacate and cease all uses" of the surplus properties within 30 days. Cornerstone disputed the clarity of those communications. At the end of that 30 days, Cornerstone still had personal property at four of the Precision-owned properties; it is unclear from the record how many of the properties owned by the other entities still contained Cornerstone property at that time.

The dispute over the surplus properties continued, and suit was filed against Cornerstone on October 30, 1998, with the first amended petition filed on November 3, 2000, and the second amended petition on August 15, 2001. *See Precision Invest.*, 119 S.W.3d at 613. The plaintiffs listed in the second amended petition were Precision, CIC, Empire Ranch, and Plaster, individually, and as trustee of the RWP Trusts. *See id.* at 611–12. The properties at issue in the lawsuit were eight owned by Precision (representing eight of the nine sold from Empire to Precision prior to the merger), five by CIC, one by Empire Ranch, and five by the RWP Trusts. Each of the plaintiffs advanced claims of trespass, quantum meruit/unjust enrichment, and ejectment against Cornerstone with respect to the specific property or properties owned.

On August 15, 2001, an order was filed granting Cornerstone's demand for arbitration, pursuant to the Agreement, for the claims asserted by Precision. Those claims, Counts I, II, and III in the second amended petition, were "stayed pending arbitration." *See id.* at 613. The remaining counts of the other plaintiffs proceeded to trial and a "judgment" in that bench trial was entered on March 22, 2002, against Cornerstone and in favor of CIC, Empire Ranch, and Plaster, both individually and as trustee of the RWP Trusts, on the trespass, unjust enrichment, and ejectment counts. Compensatory and punitive damages were awarded.[1]

Within the arbitration, Cornerstone, as claimant, advanced claims of negligent or fraudulent misrepresentation in the sale of the eight properties at issue to Precision. Cornerstone sought rescission of the sale of those properties, restoration to Precision of the amounts paid, and a declaration of non-liability in the counterclaims raised by Precision. Cornerstone also asserted that Precision lacked standing in its claims because it was administratively dissolved as a corporation from June 19, 1998, to December 6, 2001, when it was reinstated in Tennessee. Precision's counterclaims in the arbitration were for trespass, unjust enrichment, and ejectment, for which it sought compensatory and punitive damages.

On April 8, 2002, counsel for Precision faxed a letter to the arbitrator informing him that a "judgment" had been entered in the companion case. According to the letter, "[t]he decision is provided for [the arbitrator's] consideration, as [he] deem[s] appropriate." Counsel for Cornerstone also faxed a letter on that same day requesting that the arbitrator not consider the findings contained in the decision, "which [Cornerstone] deem[ed] to be clearly erroneous on many levels." Cornerstone further asked that if the arbitrator chose to consider the companion case decision, he so state in the award.

The arbitrator's award was signed and notarized on April 9, 2002. In the award, the arbitrator denied Cornerstone's claims for negligent or fraudulent misrepresentation, as well as Precision's counterclaims for trespass, unjust enrichment, and ejectment. The arbitrator also found that, under Tennessee law, the administrative reinstatement of Precision in December 2001, "had the legal effect that the administrative dissolution on June 19, 1998 never occurred." Further, because of the reinstatement in Tennessee, Precision's registration in Missouri as a foreign corporation was considered valid. With respect to the purported judgment in the companion case, the arbitrator stated:

> On April 8, 2002, each party has communicated with the arbitrator regarding the above-captioned related lawsuit. The arbitrator has not considered these communications and enclosures in rendering this Award. For the parties' information, this award was prepared before these communications were received.

Cornerstone filed an application for confirmation of the award, and Precision filed a motion to vacate the award in which it argued that the arbitrator was required to give collateral estoppel effect to the deci-

---

1. This Court recently dismissed Cornerstone's appeal of that purported judgment, finding that it did not contain an "express determination that there is no just reason for delay." *Precision Invest., L.L.C. v. Cornerstone Propane, L.P.,* 119 S.W.3d 611, 614 (Mo.App. 2003). Lack of final judgment does not affect the reasoning in this opinion. As is later explained, even if there had been a final judgment in the companion case, it would not have been binding on the arbitrator.

sion in the companion case. After hearing arguments on the motions, the trial court made a docket entry on November 18, 2002, denying Precision's motion to vacate because the arbitrator's award had been prepared prior to the receipt of communications regarding, and a copy of, the purported judgment in the companion case. The trial court also indicated that the "judgment" in the companion case was not final when faxed to the arbitrator. Precision filed a motion for new trial on December 9, 2002.

On January 8, 2003, the court initially entered a judgment confirming the arbitration award. The court then heard arguments on Precision's motion for new trial, which was sustained. The court proceeded to set aside its order and judgment of November 18, 2002, as well as its confirmation of the arbitrator's award.

On March 21, 2003, the trial court filed its judgment outlining the decisions from January 8, 2003. According to the trial court, the arbitrator was required to give the "judgment" from the companion case collateral estoppel effect, and that he manifestly disregarded the law by failing to give such effect to the purported judgment. The trial court remanded the cause back to the American Arbitration Association with directions for it to determine liability in light of the "judgment" in the companion case, and to compute actual and punitive damages.

This appeal followed.

## Discussion

■ Cornerstone raises four points on appeal and contends that the trial court erred in granting Precision's motion to vacate the arbitrator's award. Two questions are vital to the consideration of the issues raised in this appeal. Were the elements of collateral estoppel present? If so, was the failure to give the purported judgement in the companion case collateral estoppel effect grounds for vacating the arbitration award? These two questions are the basis of Cornerstone's first point, in which it argues that collateral estoppel was not applicable to the situation but that, even if collateral estoppel was applicable, any misapplication of the law by the arbitrator is not grounds for vacating the award. As will be shown below, this first point is dispositive.

■ Arbitration proceedings are favored and encouraged by the courts. *Westridge Investment Group, L.P. v. McAtee*, 968 S.W.2d 243, 245 (Mo.App.1998). The object of arbitration is to obtain a settlement that will put an end to the dispute; therefore, every reasonable meaning is indulged in favor of an arbitration award. *Sheffield Assembly of God Church, Inc. v. The American Ins. Co.*, 870 S.W.2d 926, 929 (Mo.App.1994). Judicial review of arbitration awards is limited and it is not the function of the courts to determine if the arbitrator decided the grievance correctly, as long as the arbitrator acted within his or her jurisdiction under the contract to arbitrate. *In re Estate of Sandefur*, 898 S.W.2d 667, 669–70 (Mo.App.1995).

Section 435.405, RSMo 2000, sets forth the grounds under which a circuit court may vacate an award. *Westridge*, 968 S.W.2d at 245. Under § 435.405.1, the statute provides:

1. Upon application of a party, the court shall vacate an award where:

(1) The award was procured by corruption, fraud or other undue means;

(2) The was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 435.370, as to prejudice substantially the rights of a party; or

(5) There was no arbitration agreement and the issue was not adversely determined in the proceedings under section 435.355 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

■ The only one of these grounds that provides any basis to vacate the award here is that the arbitrator exceeded his powers. Neither a mistake of law nor a mistake of fact provides sufficient reason to vacate an arbitration award. *Sheffield,* 870 S.W.2d at 931. A mistake of law or erroneous interpretation of the law does not constitute an excess of an arbitrator's powers. *Western Waterproofing Co., Inc. v. The Lindenwood Colleges,* 662 S.W.2d 288, 291 (Mo.App.1983). "An arbitration award, regular on its face, not the result of fraud or collusion, finally concludes and binds the parties on the merits of all matters properly within the scope of the award, both as to law and facts, and the courts will have no inquiry as to whether the determination thereon was right or wrong, for the purpose of interfering with the award." *R.L.Hulett & Co. v. Barth,* 884 S.W.2d 309, 311 (Mo.App.1994).

■ Under the Missouri law, manifest disregard for the law is not a statutory basis for vacating an arbitration award. *Stifel, Nicolaus and Co., Inc. v. Francis,* 872 S.W.2d 484, 486 (Mo.App.1994). If federal law is applied, i.e., the Federal Arbitration Act ("FAA"), an arbitration award may be set aside if it is made in manifest disregard of the law. *Madden v. Kidder Peabody & Co., Inc.,* 883 S.W.2d 79, 82 (Mo.App.1994). However, even under the FAA, applying the exception is severely limited and an award will only be vacated on this ground if the complaining party establishes that the arbitrator understood and correctly stated the law, but proceeded to ignore it. *Id.* Based on our analysis, we do not reach the issue of whether the FAA is applicable and therefore, whether the trial court erred in its use of manifest disregard of the law as a basis to vacate the award.

■ To determine whether applying collateral estoppel is appropriate, four factors are considered: 1.) whether the issue decided in the prior adjudication was identical with the issue presented in the current action; 2.) whether the prior adjudication resulted in a judgment on the merits; 3.) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and 4.) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. *Missouri Mexican Products, Inc. v. Dunafon,* 873 S.W.2d 282, 284 (Mo.App.1994).

Precision argues that the issues in the companion case were "substantially identical" to its counterclaims in the arbitration. According to Precision, the actions of which all plaintiffs complained were similar, including Cornerstone's alleged occupation and use of the properties by storing items such as propane tanks there. Although this may be true, the purported judgment of the companion case contains no findings of fact or conclusions of law related to Precision or to any alleged acts that occurred with respect to those eight

properties. The counts in the petition related to Precision were in effect removed in their entirety and sent to arbitration, per the Agreement. There is no showing in the record before us that would permit us to determine whether the trial court in the companion case heard evidence regarding properties other than those owned by CIC, Empire Ranch, and the RWP Trusts.

The transaction concerning the sale of the eight properties from Empire to Precision was completed through the Agreement based on NGC's concern of potential environmental liability with these properties. Thus, these properties were considered differently from the others within the merger transaction. Did this affect how Cornerstone utilized the properties? There were no findings by the trial court in the companion case, and, as indicated above, nothing in the record to show that there was evidence before the trial court to allow us to answer that question.

What the arbitrator considered was the dispute and the relationship pursuant to the Agreement. The powers of the arbitrator are set and defined by the contract to arbitrate the Agreement. *Westridge*, 968 S.W.2d at 245. The premise and scope of the arbitration were defined by the Agreement. *Sandefur*, 898 S.W.2d at 669. The issues and claims presented to the arbitrator were from that contract. *See Sheffield*, 870 S.W.2d at 930. Thus, the issues were different from those presented in the companion case and thereby, Precision fails on the first element necessary to give collateral estoppel effect to the decision.

### Conclusion

Based upon the above analysis, we find merit in Cornerstone's Point I because the first factor necessary to apply collateral estoppel was not met. This point is dis-

positive; thus, we will not address Cornerstone's remaining three points.

The judgment of the trial court vacating the arbitration award is reversed and the cause remanded to the trial court with directions for it to enter an order confirming the award.

BARNEY, P.J., and GARRISON, J., concur.